S12A0876. NICELY v. THE STATE.
(733 SE2d 715)

BLACKWELL, Justice.

Billy D. Nicely was tried by a Hall County jury and convicted of the murder of Tayore Wright, a one-year-old girl. On appeal, Nicely contends that his father was denied equal protection when the father

was excluded from portions of the trial pursuant to the rule of witness sequestration, OCGA § 24-9-61, while the mother of Tayore was permitted to attend the trial pursuant to a statutory exemption to the rule of sequestration contained in the Crime Victims' Bill of Rights, OCGA § 17-17-9 (b). Nicely also claims that the trial court erred when it denied his pretrial demurrer, when it limited his cross-examination of an expert witness at trial, and when it refused to instruct the jury as Nicely requested. Upon our review of the record and briefs, we find no error, and we affirm.[1]

1. Viewed in the light most favorable to the verdict, the evidence shows that Nicely lived with Shawndia Rogers and her two young children — one of whom was Tayore — in an apartment in Gainesville. On the afternoon of March 30, 2009, Rogers left the apartment for work, leaving the children in Nicely's care. At that time, Tayore appeared to be uninjured and in no distress. About five hours later, Nicely telephoned his aunt and said that Tayore was not breathing. The aunt and a family friend went to the apartment, where they found Tayore unresponsive. Nicely told his aunt that Tayore had fallen down the stairs when he was attending to the other child and that he did not see Tayore fall. The aunt attempted unsuccessfully to revive Tayore, and the family friend called for emergency assistance. Nicely left the apartment before paramedics and other emergency response personnel arrived, and he did not return. The paramedics were able to revive Tayore in the apartment, but the next day, she died in the hospital.

According to Nicely, after he left the apartment, he spent the night sitting "in the dark behind some houses just thinking about what happened." He also made more than 100 telephone and text-message contacts with various friends and relatives, including a cousin to whom he explained that he did not want to go to prison for the rest of his life. The next day, Nicely went to the Gainesville Police Department, where he gave an account of the incident in which Tayore was injured that was inconsistent with the story that he

---

[1] The events that form the basis for the conviction occurred on March 30, 2009. Nicely was indicted on April 15, 2009 and charged with cruelty to a child in the first degree, aggravated assault, and two alternative counts of felony murder, one premised on cruelty to a child, the other on aggravated assault. The trial commenced on December 6, 2010, and the jury returned its verdict on December 15, 2010, finding Nicely guilty on all counts. The trial court entered a judgment of conviction for felony murder predicated on cruelty to a child, merged the remaining counts, and sentenced Nicely to imprisonment for life. Nicely filed his motion for new trial on December 29, 2010 and amended it on September 23, 2011. The trial court denied the motion for new trial on October 4, 2011. Nicely timely filed his notice of appeal on November 1, 2011, and the case was docketed in this Court for the April 2012 term and submitted for decision on the briefs.

earlier told to his aunt. At the police station, Nicely claimed that he was sliding Tayore down a handrail along the stairs in the apartment when she suddenly jerked out of his grasp, fell over the handrail, and hit her head on the floor below.

At trial, the State called two medical experts as witnesses. Dr. Gerald Gowitt, the Hall County medical examiner, performed an autopsy of Tayore and testified about her injuries. He said that he observed several small bruises on her head and cheeks and that, when he opened her scalp, he observed additional injuries, including multiple blunt-impact sites and hemorrhaging in the forehead and frontal and temporal scalps, as well as a blunt-impact site and hemorrhaging near the back of her head. Moreover, he found swelling in her brain, multiple areas of subdural and subarachnoid hemorrhaging, retinal hemorrhaging, and a schisis cavity in her right eye. Dr. Gowitt testified that the injuries to Tayore were consistent with her having been beaten with a blunt object, and he said that some of the injuries could have been caused by her having been shaken. He also testified that her injuries were inconsistent with a short fall, such as a fall from the handrail in the apartment. Dr. Jordan Greenbaum, medical director at Children's Healthcare of Atlanta's Child Protection Center and a board-certified forensic pathologist, testified that it was "impossible" for Tayore to have sustained her injuries in a short fall. Dr. Greenbaum opined that a violent, repetitive whiplash motion, which could result from a beating or excessive shaking, caused Tayore's death.

In his defense, Nicely called Rogers as a witness, and she testified that Nicely was a good caregiver and had a positive relationship with her children. Nicely also called his father, who testified about praying with Nicely and then taking Nicely to the police station on the morning after the incident in which Tayore was injured. In addition, Nicely presented expert testimony that conflicted with the testimony of Drs. Gowitt and Greenbaum. As we have explained before, however, "[i]t is the role of the jury to resolve conflicts in the evidence and to determine the credibility of witnesses, and the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Allen v. State*, 288 Ga. 263, 264 (1) (702 SE2d 869) (2010) (citation and punctuation omitted). The evidence in this case was sufficient to authorize a rational trier of fact to find Nicely guilty beyond a reasonable doubt of the crime of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. We turn now to Nicely's contention that his father was denied equal protection when the trial court excluded him from some of the trial proceedings pursuant to the rule of sequestration, but allowed

Rogers to attend as the mother of Tayore, notwithstanding that Rogers too was a witness at trial. Known as the rule of sequestration, OCGA § 24-9-61 provides that any party to a trial "shall have the right to have the witnesses of the other party examined out of the hearing of each other."[2] See also *Williams v. State*, 277 Ga. 853, 857 (5) (596 SE2d 597) (2004). A statutory exemption to the rule appears, however, in the Crime Victims' Bill of Rights:

> A victim of a criminal offense who has been or may be subpoenaed to testify at such hearing or trial shall be exempt from the provisions of Code Section 24-9-61 requiring sequestration; provided, however, that the court shall require that the victim be scheduled to testify as early as practical in the proceedings.

OCGA § 17-17-9 (b). As the mother of a deceased, child victim of the crimes for which Nicely was tried, Rogers was a "victim" of these crimes for the purposes of this statutory exemption. See OCGA § 17-17-3 (11) (B) (iii), (C).[3] The trial court in this case excluded Nicely's father from the trial until after he testified, but it permitted Rogers to attend even before she testified. Nicely contends that this disparate treatment — the result of the trial court applying the statutory rule of sequestration to the father, and the statutory exemption contained in the Crime Victims' Bill of Rights to Rogers — amounts to a denial of the constitutional guarantee of equal protection.[4] We disagree.

---

[2] The rule of sequestration was incorporated, with some modifications of the statutory language, into the recent revision of the Evidence Code. See OCGA § 24-6-615 (effective January 1, 2013).

[3] For purposes of the Crime Victims' Bill of Rights, OCGA § 17-17-3 (11) defines "victim" as:

(A) A person against whom a crime has been perpetrated or has allegedly been perpetrated;

(B) In the event of the death of the crime victim, the following relations if the relation is not either in custody for an offense or the defendant:

(i) The spouse;

(ii) An adult child if division (i) does not apply;

(iii) A parent if divisions (i) and (ii) do not apply;

(iv) A sibling if divisions (i) through (iii) do not apply; or

(v) A grandparent if divisions (i) through (iv) do not apply; or

(C) A parent, guardian, or custodian of a crime victim who is a minor or a legally incapacitated person except if such parent, guardian, or custodian is in custody for an offense or is the defendant.

[4] Although Nicely characterizes this contention as a challenge to the constitutionality of the exemption contained in the Crime Victims' Bill of Rights, it is apparent that his real complaint is not that Rogers was permitted to attend the trial pursuant to that exemption, but instead that his father was excluded pursuant to the general statutory rule of sequestration. So,

Generally speaking, the guarantee of equal protection "is concerned with arbitrary government classification," *Engquist v. Oregon Dept. of Agriculture*, 553 U. S. 591, 602 (II) (B) (128 SC 2146, 170 LE2d 975) (2008), and it requires that the law treat similarly situated persons alike, unless adequate reason exists to treat them differently. See id. Accordingly, to show a denial of equal protection, one first must demonstrate that the law treats him differently than similarly situated persons. *Fair v. State*, 288 Ga. 244, 246 (1) (A) (702 SE2d 420) (2010). If it is shown that the law, in fact, treats him differently than similarly situated persons, a court then must inquire whether adequate reason exists for doing so. Differential treatment that is based on an inherently suspect classification or that interferes with the exercise of a fundamental right is subject to strict scrutiny, see id., and such treatment ordinarily can be justified only when it is sufficiently related to a compelling state interest. *Poulos v. McMahan*, 250 Ga. 354, 355, n. 1 (297 SE2d 451) (1982). Differential treatment that neither involves a suspect classification nor interferes with a fundamental right, however, is subject to less exacting scrutiny, and it generally can be justified when rationally related to a legitimate state interest. *Fair*, 288 Ga. at 246 (1) (A). See also *Rodriguez v. State*, 275 Ga. 283, 286 (2) (565 SE2d 458) (2002).

In support of his contention that his father was denied equal protection,[5] Nicely contends that his father and Rogers were similarly situated at his trial, both having a familial interest in the "subject matter" of the trial, one as a parent of the defendant, the other as a parent of the victim. The two quite clearly were treated differently, his father being excluded from portions of the trial, and Rogers being permitted to attend. This differential treatment, Nicely argues, must be subjected to strict scrutiny because it infringes on a fundamental right, namely his own constitutional right to a public

---

as we understand it, Nicely actually is challenging the constitutionality of the statutory rule of sequestration, OCGA § 24-9-61, as amended by the Crime Victims' Bill of Rights, OCGA § 17-17-9 (b), and as applied in this case.

[5] Nicely also contends in his briefs that Nicely himself was denied equal protection by the differing treatment of his father and Rogers. Nicely fails, however, to clearly identify any person similarly situated to him that was treated differently than he was. To the extent that he implies that he and Tayore were similarly situated but treated differently – his parent being excluded, but her parent being permitted to attend – his claim fails at the first step of the equal protection analysis because Nicely and Tayore were not, in fact, similarly situated. Nicely was available to attend the trial in person, but Tayore quite obviously was not. Tayore could be present at the trial only through the person of another, and that is precisely what the exemption afforded to her mother by the Crime Victims' Bill of Rights permitted. "The Constitution does not require things which are different in fact to be treated in law as though they were the same." *Rinaldi v. Yeager*, 384 U. S. 305, 309 (86 SC 1497, 16 LE2d 577) (1966) (citation and punctuation omitted). Nicely and Tayore simply were not similarly situated, and for that reason, Nicely cannot show that he was denied equal protection himself.

trial. And because the State cannot show, he says, that the differential treatment is adequately related to a compelling state interest, it amounts to a denial of equal protection. Even assuming that Nicely has standing to assert an equal protection claim on behalf of his father,[6] and assuming that his father and Rogers were similarly situated, we are unpersuaded that his father was denied equal protection.

Whether a right is fundamental for purposes of equal protection generally depends on whether it is "explicitly or implicitly guaranteed by the Constitution," *San Antonio Independent School Dist. v. Rodriguez*, 411 U. S. 1, 33 (II) (B) (93 SC 1278, 36 LE2d 16) (1973), and a public trial certainly is guaranteed explicitly by the Sixth Amendment of the United States Constitution. Moreover, the United States Supreme Court has characterized the constitutional right to a public trial as a "fundamental" one, albeit not in the context of an equal protection claim. See *Herring v. New York*, 422 U. S. 853, 857 (II) (95 SC 2550, 45 LE2d 593) (1975). See also *In re Oliver*, 333 U. S. 257, 273 (68 SC 499, 92 LE 682) (1948) (federal constitution requires public trials in state criminal proceedings as an element of due process). Nevertheless, the application in this case of the rule of sequestration does not infringe upon that right.

Nicely does not point us to a single case in which the sequestration of a witness was held to violate the right to a public trial, and we have found none. To the contrary, we have found case upon case in which courts have held that the rule of sequestration ordinarily does not even implicate the right to public trial, much less infringe upon it. See, e.g., *State v. Jordan*, 325 SW3d 1, 53 (II) (Tenn. 2010) ("The sequestration of individual witnesses pursuant to the rule does not threaten any of these interests [that the right to a public trial is meant to safeguard]"); *People v. Baker*, 926 NE2d 240, 246 (N.Y. 2010) (finding that precedents applying Sixth Amendment principles "have no bearing" on exclusion of potential witness); *State v. Ulate*, 219 P3d 841, 852 (Kan. App. 2009) ("We agree with the State that Ulate's argument is better characterized as a sequestration issue than a Sixth Amendment issue."); *Commonwealth v. Jones*, 884 NE2d 532, 535 (1) (Mass. App. 2008) ("We do not view Doyle's exclusion as a

---

[6] Whether one may be heard to assert the rights of another is a question of prudential standing, *Granite State Outdoor Advertising, Inc. v. City of Roswell*, 283 Ga. 417, 418 (1) (658 SE2d 587) (2008), and we note that prudential standing generally is not jurisdictional. See *American Iron & Steel Institute v. OSHA*, 182 F3d 1261, 1274, n. 10 (11th Cir. 1999). If the standing question in this case were jurisdictional, we would not so readily assume standing. See *Steel Co. v. Citizens for a Better Environment*, 523 U. S. 83, 94 (III) (118 SC 1003, 140 LE2d 210) (1998).

closure of the court room [for the purposes of the Sixth Amendment], but rather as the proper exercise of a judge's discretion to order the sequestration of witnesses . . . ."); *United States v. Izac*, 239 Fed. Appx. 1, 4 (II) (B) (4th Cir. 2007) (where witness "was subject to exclusion in any event under [rule of sequestration] once the trial began," defendant's "Sixth Amendment right to a public trial was not implicated" by exclusion of witness during jury selection); *State v. Peterson*, Case No. A05-682, 2006 Minn. App. Unpub. LEXIS 821, *5 (I) (A) (Minn. App. 2006) ("The sequestration ruling did not implicate Sixth Amendment guarantees."); *State v. Culkin*, 35 P3d 233, 259 (III) (D) (Haw. 2001) ("[W]e hold the right to a public trial is not implicated by the exclusion of a potential witness pursuant to the witness exclusionary rule."); *Tharp v. State*, 763 A2d 151, 160 (Md. 2000) (witnesses sequestered under the rule "are no longer considered members of the general public for purposes of exclusion from the courtroom during criminal proceedings, and a criminal defendant's right to a public trial is in no way damaged by proper sequestration . . . ."); *State v. Taylor*, 612 NE2d 543, 548 (Ill. App. 1993) ("Because defendant's mother and stepfather were listed in discovery as potential witnesses, we tend to look upon this issue not as an action by the State which is directed at defendant's [S]ixth [A]mendment right to a public trial, but rather as an act of the parties to exercise a long-standing trial right in criminal cases to request the exclusion of witnesses from the courtroom as part of the usual trial process."); *State v. Cyrulik*, 214 A2d 382, 383 (R.I. 1965) ("Fundamentally, we think the issue presented here only indirectly raises that of defendant's constitutional right to a public trial and that the basic question before us pertains to the power of the trial court to exclude witnesses from the courtroom."); *State v. Cottone*, 145 A2d 509, 516 (IV) (N.J. Super. 1958) ("The situation here is governed, not by the [state] constitutional provision guaranteeing the right to a public trial . . . but by the general rule of judicial discretion applicable to the exclusion of witnesses."); *State v. Worthen*, 100 NW 330, 331 (Iowa 1904) ("We do not think the sequestration of the defendant's witnesses infringed upon his constitutional right to a public trial."). At least in the circumstances of this case, we see no infringement of the constitutional right to a public trial by the exclusion of a single witness pursuant to a routine application of the rule of sequestration. Compare *Purvis v. State*, 288 Ga. 865, 866 (1), n. 3 (708 SE2d 283) (2011) (finding violation of right to public trial, but noting that brother, who was excluded from trial, "sought to attend the trial 'just as a member of the general public,'" not as a witness) (punctuation omitted). We certainly see no infringement sufficient enough to trigger strict scrutiny for purposes of equal protection.

Consequently, the differential treatment of Nicely's father and Rogers passes equal protection muster so long as it is rationally related to a legitimate state interest. *Fair*, 288 Ga. at 246 (1) (A). We think that such a rational relationship exists. The rule of sequestration itself undoubtedly promotes legitimate state interests in, among other things, restraining witnesses from "tailoring their testimony to that of earlier witnesses" and "aid[ing] in detecting testimony that is less than candid." *Geders v. United States*, 425 U. S. 80, 87 (96 SC 1330, 47 LE2d 592) (1976) (citations and punctuation omitted). Likewise, the statutory exemption to the rule contained in the Crime Victims' Bill of Rights promotes legitimate state interests, namely the interest of the State in according to crime victims the same right to be present as the Constitution accords to the accused. See OCGA § 17-17-1. Nicely does not even contend that the differential treatment of his father and Rogers bears no rational relationship to legitimate state interests, and we conclude that it certainly does. For these reasons, the differential treatment of these two witnesses did not work a denial of equal protection.

3. Nicely also contends that the trial court erred when it denied his pretrial demurrer as to the aggravated assault count of the indictment. Nicely argues that the indictment failed to specify the weapon or instrument that he allegedly used to assault Tayore, and he claims that this failure left him unable to prepare an adequate defense. But the trial court entered a judgment of conviction against Nicely, and sentenced him, only for felony murder predicated on cruelty to a child. The trial court merged the aggravated assault and felony murder predicated on aggravated assault counts into the conviction for felony murder predicated on cruelty to a child. Because "merger renders a conviction void, any error as to [the aggravated assault] count is harmless." *Black v. State*, 309 Ga. App. 880, 883 (3) (711 SE2d 428) (2011) (citation and punctuation omitted). See also *John v. State*, 282 Ga. 792, 795 (5) (653 SE2d 435) (2007) (where felony murder count merged with conviction for malice murder, complaint about jury charge on felony murder was moot).

4. Next, we turn to the contention that the trial court erred and denied Nicely his constitutional right of confrontation when it limited his cross-examination of Dr. Gowitt. More specifically, Nicely asserts that he should have been permitted to cross-examine Dr. Gowitt about an understanding among some Georgia medical examiners that one will not testify "against" the findings of another, an understanding that Dr. Gowitt allegedly has adopted. This line of cross-examination was important, Nicely contends, because Dr. Gowitt relied in part in forming his own opinions on findings by Dr. Greenbaum about the injuries to Tayore, and cross-examination about an

understanding among some Georgia medical examiners would tend to show that Dr. Gowitt might have tailored his own opinions and his own testimony to be consistent with the findings of Dr. Greenbaum.[7]

Although the Sixth Amendment right to confrontation secures the right of cross-examination, *Davis v. Alaska*, 415 U. S. 308, 315 (2) (94 SC 1105, 39 LE2d 347) (1974), the right of cross-examination "is not an absolute right that mandates unlimited questioning by the defense." *Howard v. State*, 286 Ga. 222, 225 (2) (686 SE2d 764) (2009) (citation and punctuation omitted). To the contrary, trial courts "retain wide latitude . . . to impose reasonable limits on cross-examination based on concerns about, among other things . . . interrogation that is . . . only marginally relevant." *Young v. State*, 290 Ga. 441, 444 (5) (721 SE2d 839) (2012) (citation and punctuation omitted). See also *Sanders v. State*, 290 Ga. 445, 446 (2) (721 SE2d 834) (2012). The permissible scope of cross-examination is committed to the sound discretion of the trial court, and we review a limitation of the scope of cross-examination only for abuse of discretion. *Hampton v. State*, 289 Ga. 621, 626-627 (5) (713 SE2d 851) (2011). We see no abuse of discretion here.

The trial court permitted Nicely to examine Dr. Gowitt outside the presence of the jury about any understanding among medical examiners, and Dr. Gowitt explained that this understanding would not extend in any event to Dr. Greenbaum, who is not a medical examiner. Moreover, Dr. Gowitt testified unequivocally that he did not feel bound — "legally, ethically, morally, or any other way" — to adopt or accept the findings of Dr. Greenbaum. In these circumstances, the trial court did not abuse its considerable discretion in disallowing cross-examination on any common understanding among some medical examiners.

5. Last, we consider the contention that the trial court erred when it conditioned a jury charge that Nicely requested — a charge on cruelty to a child in the second degree, as a lesser included offense of cruelty to a child in the first degree — upon the giving of another charge that, Nicely says, was improper. The record of the charge conference shows that the trial court was willing to give a charge on cruelty to a child in the second degree, but the trial court indicated that, if it did so, it also would charge the jury that felony murder properly could be predicated on cruelty in the second degree. Nicely

---

[7] Nicely also claims that this line of cross-examination was relevant to establish bias on the part of Dr. Gowitt, inasmuch as the understanding among medical examiners would preclude him generally from testifying for an accused in a homicide prosecution in Georgia. But Nicely waived this argument because he failed to raise it in the trial court. *Butler v. State*, 285 Ga. 518, 519 (2) (678 SE2d 92) (2009).

argued at trial that cruelty to a child in the second degree could not properly form the basis for felony murder in this case because cruelty in the second degree is not a felony that is "inherently dangerous," and when the trial court disagreed, he withdrew his request to charge on cruelty in the second degree.[8]

Had Nicely not withdrawn his request to charge, the trial court would have been authorized to give both the requested charge and a charge that felony murder might properly be predicated in this case on cruelty in the second degree. As we have explained before,

> [t]he only limitation on the type of felony that may serve as an underlying felony for a felony murder conviction is that the felony must be inherently dangerous to human life. For a felony to be considered inherently dangerous, it must be "dangerous per se" or it must "by its circumstances create a foreseeable risk of death." In determining whether a felony meets that definition, this Court does not consider the elements of the felony in the abstract, but instead considers the circumstances under which the felony was committed.

*Chance v. State*, 291 Ga. 241, 242 (1) (728 SE2d 635) (2012) (citation and punctuation omitted).

Nicely requested a charge on cruelty in the second degree as a lesser included offense based on evidence of his statement to police officers that Tayore fell from a handrail along the stairs as he was sliding her down it. Nicely contends that exposing a child to a short fall — five or six feet — does not create a foreseeable risk of death, pointing to the testimony of Dr. Gowitt in this case that such a fall would rarely result in death. But Dr. Gowitt did not testify that the risk of death from such a fall was *unforeseeable*, and, in any event, the evidence on the likelihood of death from a short fall was not undisputed. One of Nicely's own experts testified that studies assessing the risk of death from a short fall are unreliable and that, although death might not usually or even commonly result from such a fall, "it is recognized that short distance falls can result in death through subdural bleeding and retinal hemorrhaging." We need not decide,

---

[8] Because Nicely withdrew his request to charge the jury on cruelty in the second degree, the trial court did not specify the precise language with which it intended to charge the jury on felony murder predicated on cruelty in the second degree. Accordingly, the correctness of a specific charge on felony murder is not before us. We consider only whether felony murder, generally speaking, might properly have been predicated upon cruelty in the second degree under the facts of this case.

however, whether a risk of a child of tender years falling five or six feet poses a foreseeable risk of death.

Even if we accept that exposure to a short fall does not create such a risk, the evidence authorized the jury to find that Nicely caused the death of Tayore in another way, one that still would warrant a charge on cruelty in the second degree as a lesser included offense, but that would clearly create a foreseeable risk of death. Cruelty in the first degree and in the second degree both involve causing "cruel or excessive physical or mental pain" to a child. The difference between the two crimes relates to the state of mind of the accused. If one causes such pain maliciously, he commits cruelty in the first degree, OCGA § 16-5-70 (b); if he does so with criminal negligence, he commits cruelty in the second degree, OCGA § 16-5-70 (c). The State's evidence showed that Tayore had suffered multiple impacts to her head, and the State's theory of the case was that Nicely caused the death of Tayore by striking her on the head or shaking her violently. One of Nicely's own experts testified, however, that it was impossible to know with certainty whether any injuries to her head were caused intentionally or accidentally. Moreover, Rogers testified that Nicely and Tayore had a loving relationship. In light of this evidence, and because the state of mind of the accused is "peculiarly [a] question[ ] for the jury," *Hinds v. State*, 296 Ga. App. 80, 80-81 (1) (673 SE2d 598) (2009), the jury might properly have found that Nicely committed cruelty in the second degree, not by sliding Tayore down a handrail, but by striking her head against a hard object or shaking her violently with criminal negligence, as opposed to malice. Nicely does not dispute that striking a child on the head or violent shaking is an "inherently dangerous" act. And because the evidence would have permitted (but did not require) a finding that Nicely struck or violently shook Tayore with criminal negligence, not malice, it would have authorized a conviction for felony murder premised on cruelty in the second degree. The trial court did not err when it conditioned the giving of a charge on cruelty in the second degree as a lesser included offense upon the giving of an additional charge that cruelty in the second degree might form a basis for felony murder.

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 29, 2012.

*Adam S. Levin*, for appellant.

*Lee Darragh, District Attorney, Wanda L. Vance, Assistant District Attorney, Samuel S. Olens, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason C. Fisher, Assistant Attorney General*, for appellee.